UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL GADDIS,<br><br>        Plaintiff,<br><br>    v.<br><br>RAMIREZ, et al.,<br><br>        Defendants. | Case No. 22-cv-01680-PCP<br><br>**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 21 |

       Darryl Gaddis, a California prisoner proceeding *pro se*, filed a civil rights complaint pursuant to 42 U.S.C. § 1983. Mr. Gaddis alleges that Defendants Ramirez and Cruz, both officers at Salinas Valley State Prison, were deliberately indifferent to Mr. Gaddis's health and safety needs by failing to secure a wheelchair-compatible van to transport him to a medical appointment.

       Defendants have moved for summary judgment. Dkt. No. 21 ("MSJ"). Mr. Gaddis filed an opposition and Defendants filed a reply. Dkt. Nos. 30 ("Opposition"), 31 ("Reply").

       For the reasons stated below, Defendants' motion for summary judgment is **GRANTED**.

**I.    BACKGROUND**

       The following facts are undisputed unless otherwise indicated.

       At all relevant times, Mr. Gaddis was incarcerated at Salinas Valley State Prison ("SVSP"). Defendants were employed as correctional officers at SVSP. Their duties included escorting inmates to off-site appointments as "transportation officers." MSJ at 3 (describing officers performing this function as "transportation officers").[1]

---

[1] The Court cites to Defendants' Summary Judgment Motion for ease of reading. The Court has compared the Summary Judgment Motion to each declaration and underlying exhibit to ensure the facts are accurately described.

### A.     Events before July 8, 2020

On April 3, 2020, Mr. Gaddis broke his leg during an altercation with another inmate. *See* MSJ at 2. He was placed in a full-leg cast and assigned a wheelchair and crutches to use while he recovered. *See id*.

By May 2, 2020, Mr. Gaddis was able to walk using his crutches rather than relying entirely on his wheelchair. *See id*. By May 7, 2020, Mr. Gaddis was able to run 100 feet without assistance, which he did in order to attack another inmate. *See id*. (stating that Mr. Gaddis "leap[ed] out of his wheelchair" and ran 100 feet without using his wheelchair or a cane to "beat[] on an[other] inmate").

Based on Mr. Gaddis's improvement, his primary care physician asked for Mr. Gaddis's mobility to be reevaluated. *See id*. Mr. Gaddis was assigned a "Disability Placement Program" code of "DLT," which indicated he was supposed to walk primarily on level surfaces but could climb up to six stairs.[2] *See id*. at 3. Mr. Gaddis's central file did not show that he needed a wheelchair-accessible van. *See id*. at 4.

The "DLT" code indicates an inmate has not been assigned an assistive device. *See* Dkt. No. 21-6 ("Tellez Declaration") ¶ 18 ("If an inmate is coded 'DLT,' this means that he can walk 'up at least 6 stairs' and does *not* require an ADA vehicle unless special instructions are included in his SOMS.") (emphasis in original); Ex. A (explaining Disability Placement Program codes). By contrast, inmates who require a wheelchair are assigned a code of "DPW" for a full-time wheelchair user or "DPO" for an intermittent wheelchair user. *See id*. An inmate also may be coded "DPM" or "DNM" if he requires an assistive device other than a wheelchair. *See id*.

---

[2] Mr. Gaddis argues that his central file "clearly state[d] that Plaintiff Gaddis was assigned medical [illegible] such as a wheelchair and crutches." Opp. at 10. Mr. Gaddis does not submit any evidence to support this argument. *See id*. By contrast, Defendants' evidence shows that Mr. Gaddis was assigned the DLT disability code as of July 8, 2020. MSJ at 4. Moreover, in his deposition, Mr. Gaddis conceded that he was assigned the DLT code, and that this code means "I'm not to walk up a lot of stairs. I'm supposed to be on a level -- at most times permitting, level surfaces . . . ." Dkt. No. 21-2, Ex. B, at 125:14–20.

**B.     Events of July 8, 2020**

On July 8, 2020, Mr. Gaddis had an offsite medical appointment to have his cast removed. *See id*. at 4. He was to be transported to this appointment by Defendants. *See id*. Before the appointment, Defendants reviewed Mr. Gaddis's central file and noted that he was assigned the DLT code. *See id*. The DLT code indicated that medical staff had concluded Mr. Gaddis did not need to be transported in an ADA van. *See id*. In addition, no ADA van was available to transport Mr. Gaddis to his appointment, as SVSP's only ADA van was being used for "an emergency requiring another inmate to be transported on the ADA van." *Id*. at 4; *see also id*. at 3 (explaining that emergencies take priority).

When Mr. Gaddis arrived for transportation to his appointment, he expressed his displeasure that he was not to be transported in an ADA van. *See id*. Defendants explained that no such van was available, but offered to re-schedule his appointment and book an ADA van for the rescheduled appointment. *See id*. at 4–5. Mr. Gaddis refused to reschedule his appointment. *See id*. at 5; *see also* Dkt. No. 21-2 ("Sandhu Declaration"), Ex. B, at 43:11–16, 44:25–45:2, 68:20–69:5 (Mr. Gaddis explaining in deposition that he decided it was better to be transported to the appointment in a non-ADA van than to wait to have his cast removed at a later date).

Mr. Gaddis safely boarded the non-ADA van at SVSP with Defendants' assistance, and safely disembarked at his appointment with Defendant Cruz's assistance. *See* MSJ at 5; *see also* Dkt. No. 21-4 ("Cruz Declaration") ¶¶ 21–22 (stating that Defendant Cruz helped Mr. Gaddis board and exit the van). At his appointment, Mr. Gaddis's cast was removed and he was placed in a walking boot. *See* MSJ at 5. Mr. Gaddis's doctor told him, in Defendants' presence, that he "could walk in the boot." Sandhu Decl., Ex. B, at 122:22–25. In his deposition, Mr. Gaddis conceded that he could take "a few steps" in the boot. *Id*. at 125:4–6. Defendants represent that they saw Mr. Gaddis "take a few steps both with and without his walking boot" and "put some weight on his foot without difficulty" after receiving the walking boot. Cruz Decl. ¶¶ 25–26; Dkt. No. 21-5 ("Ramirez Declaration") ¶¶ 25-26. Defendants helped Mr. Gaddis to board the non-ADA van for the return trip to SVSP. Cruz Decl. ¶ 27; Ramirez Decl. ¶ 27.

Upon arriving back at SVSP, Defendant Cruz exited the van first. MSJ at 5. In his deposition, Mr. Gaddis stated that Defendant Cruz went into SVSP's clinic upon the parties' return. *See* Sandhu Decl., Ex. B, at 66:25–67:1. Defendant Ramirez retrieved Mr. Gaddis's wheelchair and placed it immediately outside the van for Mr. Gaddis. *See* MSJ at 5; *see also* Ramirez Decl. ¶ 30. Defendant Ramirez represents that he stood outside the van so that he could assist Mr. Gaddis as he exited the van. *See id*. ¶ 31. Mr. Gaddis, however, slipped inside the van before taking the single step down that was necessary to exit. *See id*. ¶ 32; *see also* Sandhu Decl., Ex. A, at 2, 4 (Mr. Gaddis answering a request for admission with confirmation that he was inside the van when he fell); Ex. B, at 21:13–17 (Mr. Gaddis stating he was still inside the van when he fell), 25:6–12 ("Q. Okay. So you were -- as you were inside the van and Mr. Ramirez was outside waiting with a wheelchair prepared; correct? A. Yes, ma'am. Q. You fell inside the van just before getting off; correct? A. Correct.").

### C.     Treatment on and after July 8, 2020

The parties agree that Mr. Gaddis scraped his back when he fell. *See* MSJ at 5, Am. Compl. at 4.

The parties appear to dispute whether Mr. Gaddis's injury was more serious than a scrape. In his Amended Complaint, Mr. Gaddis represented that the fall caused "a lower back injur[y]." *Id*. In his Opposition, Mr. Gaddis argues that the fall "injur[ed] his back, leg, and hand." Opp. at 3. Defendants represent that Mr. Gaddis did not complain of back pain at the time of the fall or for several days thereafter, and that he had pre-existing chronic back pain. *See* MSJ at 5.

The parties appear to agree that Mr. Gaddis received adequate medical treatment post-fall. Defendants took Mr. Gaddis for medical treatment immediately after his fall, and he was immediately treated by a nurse. *See id*. at 4. When Mr. Gaddis complained of back pain, he was given x-rays on three separate occasions, which were reviewed by three separate radiologists, none of whom detected an injury. *See id*. at 6; *see also* Garcia Decl., Exs. L–N. Mr. Gaddis was also given physical therapy, although he refused to attend after the third session because he was uncomfortable with his therapist's sexuality. *See* MSJ at 6. In a medical appointment on May 13,

4

2022, Mr. Gaddis informed a nurse that he had no pain, and "no issues at this time." Garcia Decl., Ex. P.

### D. This lawsuit

Mr. Gaddis filed this lawsuit on or after March 7, 2022. *See* Compl. at 3 (signing the Complaint on that date).

The Court screened the Complaint pursuant to 28 U.S.C. § 1915A and dismissed it with leave to amend. Dkt. No. 5. Mr. Gaddis amended his complaint and alleged claims against Defendants Cruz and Ramirez, as well as a supervisory liability claim against Assistant Inspector General Howard Mosely. Dkt. No. 11 ("Amended Complaint"). The Court held that Mr. Gaddis's supervisory liability claim was inadequate, dismissed Mr. Mosely from this lawsuit, and ordered Defendants Ramirez and Cruz to respond to Mr. Gaddis's claims under the Eighth Amendment and the Americans with Disabilities Act. Dkt. No. 12.

Defendants moved for summary judgment, Dkt. No. 21 ("MSJ"), Mr. Gaddis filed an opposition, Dkt. No. 30, and Defendants filed a reply, Dkt. No. 31.

## II. Legal standard

Summary judgment is proper where the pleadings, discovery, and evidence show that there is "no genuine dispute as to any material fact and [that] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial ... since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A fact is material if it might affect the outcome of the lawsuit under governing law, and a dispute about such a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In a typical summary judgment motion, one party moves for judgment against the other on the merits of the latter party's claim. In such a situation, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine dispute of

1  material fact. The burden then shifts to the nonmoving party to "go beyond the pleadings, and by
2  his own affidavits, or by the 'depositions, answers to interrogatories, or admissions on file,'
3  designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324.
4        The court's function on a summary judgment motion is not to make credibility
5  determinations or weigh conflicting evidence with respect to a disputed material fact. *See T.W.*
6  *Elec. Serv. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must
7  be viewed in the light most favorable to the nonmoving party, and inferences to be drawn from the
8  facts must be viewed in the light most favorable to the nonmoving party. *See id.* at 631.

**III.    Analysis**

    **A.    Eighth Amendment claim**

Deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment's proscription against cruel and unusual punishment. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976). A determination of "deliberate indifference" involves an examination of two elements: the seriousness of the prisoner's medical need and the nature of the defendant's response to that need. *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *overruled on other grounds*, *WMX Technologies, Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc). A "serious" medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of pain." *Id.* (citing *Estelle*, 429 U.S. at 104). A prison official is deliberately indifferent if he knows a prisoner faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). The prison official must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but "must also draw the inference." *Id.* Consequently, for deliberate indifference to be established, there must exist both a purposeful act or failure to act on the part of the defendant and harm resulting therefrom. *See McGuckin*, 974 F.2d at 1060. If a prison official should have been aware of the risk but was not, then the official has not violated the Eighth Amendment, no matter how severe the risk. *Gibson v. County of Washoe*, 290 F.3d 1175, 1188 (9th Cir. 2002).

Mr. Gaddis states repeatedly that his Eighth Amendment claim is based on Defendants' failure to obtain a wheelchair-accessible van for his transportation. *See* Opp. at 3, 12 13, 15 (stating this is the basis of his claim). Mr. Gaddis argues that Defendants knew he needed a wheelchair-accessible van based on a review of his central file. *See* Opp. at 10. But Defendants introduce evidence that Mr. Gaddis's file did not inform them of the need to reserve a wheelchair-accessible van. *See* MSJ at 4. Rather, Mr. Gaddis's central file showed he had a DLT disability code, which meant he could walk on level surfaces and could climb up to six stairs. *See id*. at 4. Mr. Gaddis does not introduce any evidence that his central file did not include this DLT code. *See generally* Opp. He therefore has failed to carry his burden to show that Defendants were subjectively aware of his need for a wheelchair-accessible van based on their review of his central file. Indeed, Mr. Gaddis attaches Defendants' declarations that the central file did not show Mr. Gaddis used a wheelchair, and an exhibit which shows his wheelchair was "removed" on July 3, 2020. *See* Opp. at 23, 27, 33, 51, 53.

In the alternative, Mr. Gaddis argues that his arrival in a wheelchair should have made his need for a wheelchair-accessible van clear. *See id*. at 12. But Defendants introduce evidence that, by the time Mr. Gaddis arrived in his wheelchair, there was no wheelchair-accessible van available because SVSP's ADA van had been called out for an emergency. *See* MSJ at 4, 8. Defendants thus did not have the ability to obtain a wheelchair-accessible van for Mr. Gaddis. It is undisputed that Defendants informed Mr. Gaddis of this problem when he arrived in his wheelchair. *See id*. at 4–5. It also is undisputed that Mr. Gaddis decided he would rather get his cast removed that day than reschedule for a time when he could be transported in a wheelchair-accessible van. *See id*. at 5. Thus, even assuming that regulations permitted Defendants to ignore Mr. Gaddis's disability code when he arrived in a wheelchair, it is undisputed that no ADA van was available and that Mr. Gaddis decided he would rather risk transportation in a non-ADA van on July 8 than reschedule his appointment to another day to be transported in an ADA van.

With respect to the failure to reserve a wheelchair-accessible van in advance, Mr. Gaddis has not introduced any evidence that Defendants were subjectively aware of his need for one. *See Gibson,* 290 F.3d at 1188 (requiring defendants actually to have been aware of the plaintiff's need

7

before liability may be imposed). Rather, Defendants undisputed evidence shows Mr. Gaddis's central file informed them he could walk on level surfaces and walk up to six stairs. With respect to the failure to retrieve a wheelchair-accessible van once Mr. Gaddis had appeared, Mr. Gaddis has not introduced any evidence that Defendants engaged in a "purposeful act or failure to act" that caused his injury. *McGuckin*, 974 F.2d at 1060. Rather, Defendants have shown that no such vehicle was available, so it was impossible for them to retrieve one.

Defendants are therefore entitled to summary judgment on Mr. Gaddis's Eighth Amendment claim.

### B.     ADA claim

Title II of the Americans with Disabilities Act of 1990, 42 U.S.C.§ 12101 *et seq.* ("ADA"), provides "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. To state an ADA claim, the plaintiff must show "(1) the plaintiff is an individual with a disability; (2) the plaintiff is otherwise qualified to participate in or receive the benefit of some public entity's services, programs, or activities; (3) the plaintiff was either excluded from participation in or denied the benefits of the public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (4) such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability." *Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir. 2002).

Mr. Gaddis has not identified anything of which he was deprived "by reason of [his] disability." As explained above, Defendants did not book an ADA van in advance because Mr. Gaddis's central file did not indicate that they should.[3] Defendants did not retrieve an ADA van after Mr. Gaddis arrived because none was available. Thus, the undisputed facts show that Mr. Gaddis was deprived of transportation in a wheelchair-accessible van because of the information contained in his central file and because of unavailability. He was not deprived of transportation in

---

[3] Even if they had booked an ADA van in advance, that reservation would have been overridden by the emergency requiring an ADA van. *See* MSJ at 3 (explaining that emergencies take priority), 4 (explaining there was an emergency requiring the ADA van on July 8, 2020).

8

a wheelchair-accessible van because of his disability. Because the undisputed evidence shows that the causation element is unfulfilled, Defendants are entitled to summary judgment on the ADA claim. *See Del Conte v. Cnty. of Santa Clara*, No. 14-CV-05334-WHO (PR), 2016 WL 3916315, at *3 (N.D. Cal. July 20, 2016) ("The ADA and the Rehabilitation Act require a showing of causation, a link between the fact of his disability and the act of excluding him from the program. No claim is pleaded by alleging simply that because he was denied medication it must have been because of his disability.").[4]

## CONCLUSION

Defendants' motion for summary judgment is **GRANTED**. The Clerk shall terminate all pending motions and close the file.

**IT IS SO ORDERED.**

Dated: August 9, 2024

P. Casey Pitts
United States District Judge

---

[4] *See also Estrada v. Rowe*, No. C 08-2801 MMC (PR), 2010 WL 957120, at *2 (N.D. Cal. Mar. 12, 2010) ("Here, plaintiff alleges that his disability is his deteriorating health, which has resulted in his inability to stand or walk for more than thirty minutes, and that defendants Dr. Adam and Dr. Sayre have denied him the reasonable accommodations of proper medication for his chronic pain, an MRI, and referral to an orthopaedic specialist. Such allegations, however, do not support a claim that plaintiff has been discriminated against in the provision of services "by reason," i.e., *because,* of his disability. Rather, the essence of plaintiff's claim is that he is not being provided adequate medical treatment *for* his disability because defendants are acting with deliberate indifference to his serious medical needs. Consequently, the Court finds plaintiff's allegations do not state a claim for relief under the ADA.").